# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 23, 2020   Decided January 15, 2021

No. 19-7106

LLC SPC STILEKS,
APPELLEE

v.

THE REPUBLIC OF MOLDOVA,
APPELLANT

Consolidated with 19-7142

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01921)

*George C. Grasso* argued the cause and filed the briefs for appellant.

*Gene M. Burd* argued the cause and filed the brief for appellee.

Before: HENDERSON and ROGERS, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: This appeal arises from a long-running dispute between the Republic of Moldova and a Ukrainian energy provider called Energoalliance. For the better part of 1999 and 2000, Energoalliance sold electricity to a Moldovan state-owned utility. After the utility failed to pay its bill in full, Energoalliance alleged that Moldova violated its obligations under the Energy Charter Treaty. An arbitration panel agreed and a company called Stileks—which company, through a series of corporate transactions, owns the right to Energoalliance's arbitration award—now attempts to recover. Stileks and Moldova are proceeding against each other in multiple forums. In this court, the main issue is whether the district court correctly confirmed the arbitration award which, with interest, now exceeds $58 million. We uphold confirmation of the award but remand for the district court to consider whether Moldova had a settled expectation that an adverse judgment would be denominated in Moldovan lei rather than U.S. dollars.

## I. Background

Ukraine and Moldova have highly interconnected electrical systems—a legacy of the years when both states were subject to direction from Moscow. When the Soviet Union collapsed, contracts and treaties replaced central planning. An example is the Energy Charter Treaty (ECT), a multilateral agreement signed by governments on both sides of the old Iron Curtain, including Ukraine and Moldova. *See* Energy Charter Treaty, Dec. 17, 1994, 2080 U.N.T.S. 95 [hereinafter ECT]. Its purpose is to encourage and protect cross-border investment in the energy industry.

In 1999, Energoalliance signed a series of contracts to sell electricity to Moldtranselectro, a utility owned by the Republic of Moldova. These were not ordinary sales contracts. Ukrenergo, a Ukrainian state-owned utility, sold electricity to Energoalliance, which sold it to a British Virgin Islands (BVI) entity called Derimen Properties; that entity sold it to Moldtranselectro. The agreements were structured this way because Energoalliance wanted to avoid certain implications of the Ukrainian government's currency controls. But Energoalliance still assumed the risk of non-payment by Moldtranselectro in May 2000—after Moldtranselectro had fallen behind on its payments—and Derimen assigned the debt to Energoalliance.

Energoalliance sought recourse in Moldovan courts to collect this debt. These decade-long proceedings were unsuccessful, due in significant part to the Moldovan government's actions. To give one example, the government transferred most of Moldtranselectro's assets to several new state-owned entities, leaving the old utility with financial obligations and few tangible assets. Energoalliance claimed Moldova's actions violated the ECT. Unable to reach an amicable resolution, Energoalliance initiated arbitration proceedings under the rules of the United Nations Commission on International Trade Law (UNCITRAL) pursuant to Article 26 of the ECT.

In the summer of 2012, a three-day arbitral proceeding took place in Paris. On October 23 of the following year, the tribunal issued an award in favor of Energoalliance in the amount of some 593 million Moldovan lei in damages and interest plus 540,000 U.S. dollars in attorneys' fees and costs. Energoalliance soon began enforcement proceedings in multiple jurisdictions, including the United States, where it filed a petition to confirm the arbitral award pursuant to 9

U.S.C. § 207. Confirmation is the process by which an arbitration award is converted to a legal judgment. Once Energoalliance had a judgment in hand, it could go about enforcing the arbitration award by, for example, attaching Moldova's commercial assets in the United States.

But Moldova was not ready to concede. In its view, the tribunal lacked jurisdiction to arbitrate the dispute because the byzantine arrangement that Energoalliance struck with Derimen to avoid Ukrainian currency controls was not an "investment" within the meaning of the ECT. Moldova made this and other arguments to the Paris Court of Appeal, seeking to annul the award. The Paris court agreed with Moldova and annulled the arbitration award on Moldova's jurisdictional theory. Energoalliance appealed to France's highest civil court, the Court of Cassation. In March 2018, that court vacated the Paris court's judgment, reinstated the award and remanded Moldova's annulment application to the Paris court.

Back to the United States. After Moldova filed its annulment application with the Paris court, it submitted a letter to the U.S. District Court for the District of Columbia, requesting a stay pending resolution of its application. Before the district court could rule, the Paris court had ruled in Moldova's favor. The tables now turned, a company called Komstroy—by this point the successor-in-interest to Energoalliance—consented to Moldova's request for stay pending Komstroy's appeal to the Court of Cassation. The district court entered the stay. But in March 2018, after the Court of Cassation reinstated the award, Energoalliance moved to lift the stay and confirm the award. Moldova opposed lifting the stay until the Paris court could resolve its remaining challenges to the award. The district court sided with Energoalliance, lifting the stay. *See LLC Komstroy v. Republic*

*of Moldova*, No. 14-cv-01921, 2018 WL 5993437, at *4 (D.D.C. Nov. 13, 2018).

Once the substantive confirmation proceedings were underway, Moldova argued for dismissal on grounds of sovereign immunity, *forum non conveniens* and various defenses under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention), June 10, 1958, 21 U.S.T. 2517. The district court rejected each argument and confirmed the arbitral award. *See LLC Komstroy v. Republic of Moldova*, No. 14-cv-01921, 2019 WL 3997385, at *14 (D.D.C. Aug. 23, 2019). It also awarded Komstroy prejudgment interest and ordered that the resulting judgment be converted from Moldovan lei into U.S. dollars. Pursuant to the district court's instructions, Komstroy filed a proposed order of judgment, calculating a total judgment amount. Rather than responding to Komstroy's calculations, Moldova filed a notice of appeal and a response, arguing that the appeal divested the district court of jurisdiction. The district court confirmed its jurisdiction and entered a judgment in favor of Komstroy. *See LLC Komstroy v. Republic of Moldova*, No. 14-cv-1921, 2019 WL 4860826, at *1 (D.D.C. Oct. 2, 2019). Moldova now appeals the district court's stay-lifting order, the confirmation of the arbitral award and the final judgment. The judgment is defended by Stileks, Komstroy's assignee in bankruptcy.

## II. Analysis

This appeal presents four major issues. First, Moldova claims that the district court lacked jurisdiction under the Foreign Sovereign Immunities Act. Second, even if the district court had jurisdiction, Moldova says that it was error to confirm the arbitral award during the pendency of certain foreign proceedings. We reject both of these arguments and

affirm the district court's confirmation of the award.[1] The third and fourth issues deal with how the district court calculated and denominated its judgment. Moldova argues that the district court should not have awarded prejudgment interest and that, in any event, the judgment and any interest should have been denominated in Moldovan lei instead of U.S. dollars. We think the district court did not abuse its discretion in awarding prejudgment interest to appropriately compensate Stileks for the time value of money. When it converted the award to U.S. dollars without considering Moldova's settled expectation that the award would be payable in Moldovan lei, however, we believe it abused its discretion. We vacate that portion of its order and remand for evaluation of Moldova's reliance interests.

---

[1] Moldova makes two additional arguments that do not require sustained discussion. *First*, it argues that the district court should have dismissed the case under the *forum non conveniens* doctrine. But in *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, we said that *forum non conveniens* is not available in proceedings to confirm a foreign arbitral award because only U.S. courts can attach foreign commercial assets found within the United States. *See* 411 F.3d 296, 303–04 (D.C. Cir. 2005). Moldova asks us to reconsider *TMR Energy* in light of the Second Circuit's reasoning that "the adequacy of the alternate forum depends on whether there are *some assets* of the defendant in the alternate forum, not whether the *precise asset* located here can be executed upon there." *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 391 (2d Cir. 2011) (emphasis added). Regardless of whether we find *Figueiredo* persuasive, we are bound by our precedent. *Second*, Moldova reasserts its arguments that it was denied due process during the arbitral proceedings, which is a defense to confirmation under Article V(1)(b) of the New York Convention. But the district court ably refuted Moldova's due process arguments, *see LLC Komstroy v. Republic of Moldova*, No. 14-cv-01921, 2019 WL 3997385, at *7–9 (D.D.C. Aug. 23, 2019), and we affirm its analysis.

7

## A.

In 1976, the Congress enacted the Foreign Sovereign Immunities Act (FSIA).  Under the FSIA, foreign governments are generally immune from the jurisdiction of federal and state courts.  *See* 28 U.S.C. § 1604.  But the FSIA also established various exceptions, *see* 28 U.S.C. § 1605 (general exceptions), *id* at § 1607 (exception for counterclaims), which provide "the sole basis for obtaining jurisdiction over a foreign state in our courts."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

The district court determined that it had jurisdiction under the so-called "arbitration exception."  *See* 28 U.S.C. § 1605(a)(6).  Our first task is to determine whether that exception applies.  *See Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999).[2]  We review the

---

[2] *Creighton* states that the moving party must also demonstrate "a basis upon which a court in the United States may enforce a foreign arbitral award."  181 F.3d at 121.  That requirement is plainly satisfied.  The New York Convention allows for "the recognition and enforcement of arbitral awards" made in countries that are parties to the Convention.  *See* art. I, ¶ 1.  Under the Federal Arbitration Act, the New York Convention is federal law, *see* 9 U.S.C. § 201, and "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States," *id.* § 203.  Because Komstroy moved to confirm an arbitral award that was rendered in France, a party to the Convention, we may enforce the award under U.S. law.  *See* Restatement (Third) of Foreign Relations Law § 487 cmt. B (1987) ("the critical element is the place of the award" not the "citizenship or domicile of the parties to the arbitration"); *accord Creighton*, 181 F.3d at 121; *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 731 n.3 (D.C. Cir. 2012).

district court's determination *de novo*.  *See Kirkham v. Societe Air France*, 429 F.3d 288, 291 (D.C. Cir. 2005).

Under the FSIA's arbitration exception, a foreign state is not immune from jurisdiction of U.S. courts in any case:

> in which the action is brought . . . to confirm an award made pursuant to such an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6).  In *Chevron Corp. v. Republic of Ecuador*, we clarified that jurisdiction under the arbitration exception requires more than a claim invoking an arbitration award.  *See* 795 F.3d 200, 204 (D.C. Cir. 2015).  Rather, the existence of an arbitration agreement, an arbitration award and a treaty governing the award are all jurisdictional facts that must be established.  *See id.*; *cf. Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940–41 (D.C. Cir. 2008).

Here, only one jurisdictional fact is in dispute: whether Energoalliance's award was made pursuant to the ECT.[3] Stileks has produced copies of the ECT, the notices of

---

[3]  There is no disagreement that Moldova is a party to the ECT, which provides for arbitration of certain disputes.  Nor is there doubt that the New York Convention, ratified by the United States, calls for the enforcement of arbitral awards.  *See Creighton*, 181 F.3d at 123–24 (New York Convention "is exactly the sort of treaty Congress intended to include in the arbitration exception" (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993))).

arbitration and the tribunal's decision. In *Chevron*, we said that the petitioners, by producing similar documents, demonstrated that the arbitration exception applied. *See* 795 F.3d at 204.

Moldova counters that the ECT did not give the arbitral tribunal jurisdiction of the dispute and thus the resulting award was not "made pursuant to such an agreement to arbitrate." 28 U.S.C. § 1605(a)(6). Its argument goes something like this: the ECT protects "investments" but Derimen's claim against Moldtranselectro was not an investment within the meaning of the ECT because Derimen, a BVI entity, was not a qualifying investor. Under Moldova's jurisdictional theory, Stileks' filed documentation is insufficient. Although the ECT may establish that Moldova agreed to arbitrate certain disputes, it does not prove that it agreed to arbitrate this *particular* dispute; similarly, the tribunal's decision demonstrates only that it purported to make an award pursuant to the ECT, not that it in fact did so.

If Moldova is correct, it might have a defense to confirmation under the New York Convention, which provides for non-recognition of an award if "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." *See* New York Convention, art. V(1)(c). We have held, however, that the arbitrability of a dispute is not a jurisdictional question under the FSIA. *See Chevron*, 795 F.3d at 205–06. Moldova's brief uses Article V(1)(c) to bolster its claim of sovereign immunity, and, in so doing, it "conflates the jurisdictional standard of the FSIA with the standard for review under the New York Convention." *Id.* at 205. The FSIA's arbitration exception therefore applies and we reject Moldova's immunity claim. We construe Moldova's arbitrability argument as a defense under Article V(1)(c) of the Convention.

Before passing on the merits of that defense, we must answer a question that is logically antecedent: Who Decides? Moldova says that we should decide whether Energoalliance's claim was arbitrable under the ECT. And indeed, the background understanding is that courts, not arbitrators, decide questions of arbitrability. *See BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014). That understanding is overcome, however, if "the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (internal quotations omitted). If arbitrability itself is delegated to the arbitrators, "the court's standard for reviewing the arbitrator's decision about that matter should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). That standard is more than mere deference. A recent, unanimous opinion of the Supreme Court drove this point home. If an agreement assigns the arbitrability determinations to an arbitrator, "a court possesses no power to decide the arbitrability issue," even if it thinks the argument for arbitrability is "wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).[4]

Moldova agreed to assign arbitrability determinations to the tribunal. Under Article 26 of the ECT, all parties agree to arbitration under UNCITRAL's rules. *See* ECT, art. 26(4)(b). Those rules state that the "arbitral tribunal shall have the power to rule on its own jurisdiction." UNCITRAL Arbitration

---

[4] Citing three cases from sister circuits, Moldova asks us to apply the "wholly groundless" exception. Each of these cases was abrogated—by name—in *Henry Schein*. *See* 139 S. Ct. at 528–29 (abrogating, *inter alia*, *Douglas v. Regions Bank*, 757 F.3d 460 (5th Cir. 2014); *Turi v. Main St. Adoption Servs., LLP*, 633 F.3d 496 (6th Cir. 2011); and *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006)).

Rules, art. 23, ¶ 1 (rev. 2010 ed.).  In *Chevron*, we said that the parties' adoption of UNCITRAL's arbitration rules was "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."  795 F.3d at 208 (quoting *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1077 (9th Cir. 2013)).

The conjunction of *Chevron* and *Henry Schein* means that we must accept the arbitral tribunal's determination that Energoalliance's claim fell within the ECT.  It makes no difference that *Henry Schein* dealt with a domestic, commercial contract and the ECT is an international treaty. "[A] treaty is a contract, though between nations. Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent." *BG Group*, 572 U.S. at 37.

Moldova's only counterargument is that "the ECT is not applicable to the dispute."  In other words, the ECT's incorporation of the UNCITRAL rules is not controlling because Stileks' claim does not fall within the ECT.  This is unadorned question-begging. *Whether the ECT applies to the dispute* and *whether the tribunal had jurisdiction under the ECT* are different ways of framing the same question.  The tribunal's jurisdictional grant derived from Moldova's signature on the treaty itself, and—under our law—it is up to the tribunal to determine what the treaty means.  We thus have no authority to delve into the merits of Moldova's argument.

Admittedly, this analysis sits uncomfortably alongside the general principle that legal issues relating to defenses under the New York Convention are reviewed *de novo*. *See TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 304 (D.C. Cir. 2005).  Here, however, the question that receives *de novo* review is whether the arbitrability decision was delegated to the arbitrators.  It was.  As a consequence, it is the only

question that receives *de novo* review. *Cf. BG Group*, 572 U.S. at 29 (rejecting *de novo* review of a treaty's "local litigation requirement" in favor of deference to the arbitrator's determination). We therefore reject Moldova's argument that the tribunal lacked jurisdiction.

**B.**

Under the New York Convention, a district court may, "if it considers it proper," adjourn—that is, impose a stay of—confirmation proceedings if an application to vacate the award has been made in another jurisdiction. New York Convention, art. VI. In *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, the Second Circuit enumerated six factors that district courts should consider when making adjournment decisions. *See* 156 F.3d 310, 317–18 (2d Cir. 1998). Applying the *Europcar* factors, the district court lifted the stay it entered in April 2016. Moldova argues that, given pendency of its case in the Paris Court of Appeal, this was error.

We have yet to pronounce the standard of review for a district court's grant or denial of a motion to stay confirmation proceedings under the New York Convention. That said, we agree with the Second Circuit that "in light of the permissive language of Article VI of the Convention and a district court's general discretion in managing its own caseload and suspense docket," the appropriate standard of review is abuse of discretion. *Id.* at 316–17. Applying that standard, we affirm the district court's stay-lifting order.

We view the *Europcar* decision as the first federal appellate opinion to subject the adjournment clause to a sustained analysis. Under *Europcar*, a district court deciding an adjournment motion under the New York Convention should consider:

(1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;

(2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;

(3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;

(4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;

(5) a balance of the possible hardships to each of the parties . . . ; and

(6) any other circumstances that could tend to shift the balance in favor of or against adjournment.

*Id.* at 317–18. These factors are not all equally weighted. Because "the primary goal of the Convention is to facilitate the recognition and enforcement of arbitral awards," the Second

Circuit reasoned that the first and second factors should receive additional heft. *Id.* at 318. Although our court has yet to endorse the *Europcar* approach, it has been influential in the district court. *See*, *e.g.*, *Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas*, 314 F. Supp. 3d 95, 105–08 (D.D.C. 2018); *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, 300 F. Supp. 3d 137, 149–51 (D.D.C. 2018); *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 134–37 (D.D.C. 2015); *Arbitration of Certain Controversies Bet. Getma Int'l & Republic of Guinea*, 142 F. Supp. 3d 110, 113–19 (D.D.C. 2015).

We agree with the *Europcar* court that a district court would abuse its discretion if it failed to consider the first and second factors. We think these factors directly implicate the court's responsibility to "balance the Convention's policy favoring confirmation of arbitral awards against the principle of international comity embraced by the Convention." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1172 (11th Cir. 2004). Nevertheless, we doubt that a six-factor balancing test—enforced by appellate review—is consistent with the district court's "broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). And the language of the New York Convention itself does nothing to alter this background understanding; indeed, it is difficult to conceive of a greater delegation of discretion than "if [the court] considers it proper." New York Convention, art. VI.

We thus focus our attention on the district court's analysis of the first two factors. It was in the summer of 2010—more than 10 years ago—that Energoalliance handed Moldova a notice of arbitration. As the district court noted, this is "hardly an 'expeditious resolution' of the dispute." *LLC Komstroy*,

2018 WL 5993437, at \*3 (quoting *Hardy Expl.*, 314 F. Supp. 3d at 106). Additionally, the previous appeal-reversal-remand round at the Paris court and the Court of Cassation took over four years. *Id.* at \*4. Thus, failing to lift the stay might have forced Stileks to sit on its award for several additional years. *Id.*

In reply, Moldova simply asserts that it would be "premature" to lift the stay because of the "high probability" that the award will be overturned. The *ipse dixit* is insufficient; Moldova points to no evidence of a fair probability—much less a "high probability"—other than the fact of the remand itself. And even were we inclined to trust Moldova's prognostications, its failure to address the district court's concerns about further delay means that it has spoken to only one aspect of our inquiry. Moldova has plainly not met its burden to demonstrate that the district court abused its discretion.

## C.

The United States Supreme Court has called payment of appropriate interest "a dictate of natural justice" necessary "to repair all the damages that accrue naturally" from the breach of an obligation. *Curtis v. Innerarity*, 6 How. 146, 154 (1848). Regarding a foreign arbitral award, there are three possible categories of interest: pre-award, prejudgment (*i.e.*, after the arbitration award but before the award is converted into a U.S. judgment) and post-judgment. Here, Moldova challenges the district court's decision to grant Komstroy prejudgment interest. Applying the deferential abuse of discretion standard, *see Bucheit v. Palestine Liberation Org.*, 388 F.3d 346, 351 (D.C. Cir. 2004), we affirm.

Moldova's primary argument is that the arbitral award itself provides full compensation so prejudgment interest is

unnecessary. But confirmation petitions under the New York Convention are "deemed to arise" under the laws of the United States, 9 U.S.C. § 203, and "[p]rejudgment interest is an element of complete compensation" in U.S. law, *West Virginia v. United States*, 479 U.S. 305, 310 (1987); *see also Matter of Oil Spill by Amoco Cadiz*, 954 F.2d 1279, 1331 (7th Cir. 1992) (per curiam) (prejudgment interest is "an ordinary part of any award under federal law").

The primary purpose of prejudgment interest is "to compensate the plaintiff for any delay in payment resulting from the litigation." *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997). It also "promotes settlement and deters any attempt to benefit unfairly from inevitable litigation delay." *Moore v. CapitalCare, Inc.*, 461 F.3d 1, 13 (D.C. Cir. 2006) (awarding prejudgment interest to ERISA plaintiffs). The second rationale is especially relevant in the arbitration context, where expeditious resolution is a central objective.

Other circuits have argued that a decision to award prejudgment interest "must be exercised in a manner consistent with the underlying arbitration award." *Ministry of Def. of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1103 (9th Cir. 2011); *see also Waterside Ocean Nav. Co. v. Int'l Nav. Ltd.*, 737 F.2d 150, 154 (2d Cir. 1984). Here, although the arbitral award was silent on prejudgment interest, the tribunal granted Energoalliance pre-award interest. It reasoned that "the income which [Energoalliance] would have received if this amount had been used in its commercial activities is a part of [its] loss and is to be reimbursed by [Moldova]." We can think of no reason that this same reasoning should not apply to the award of prejudgment interest here.

**D.**

Traditionally, U.S. courts render judgments in U.S. dollars. *See* Restatement (Third) of Foreign Relations Law § 823 cmt. B (1987). Indeed, this court once believed that U.S. dollar conversion was mandatory under the Coinage Act of 1792. *See Int'l Silk Guild v. Rogers*, 262 F.2d 219, 224 (D.C. Cir. 1958) ("American courts are permitted to render judgments only in dollars."), *superseded by statute as recognized in Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 219 n.5 (D.C. Cir. 2018). Modern caselaw, however, has been more accepting of foreign currency-denominated awards, which are often desirable "when the commercial activity took place in that currency." *Amoco Cadiz*, 954 F.2d at 1328; *see also* Restatement at § 823 cmt. B ("there is no impediment to issuance by a court in the United States of a judgment denominated in a foreign currency").

Moldova claims that the district court abused its discretion by rendering the award in U.S. dollars. Energoalliance asked the arbitral tribunal for an award in Moldovan lei and later—after the lei had depreciated substantially—asked the district court for a dollar-denominated award. Had Energoalliance requested a dollar-denominated award from the beginning, Moldova might have been on notice and able to hedge against the risk of a depreciating lei. We think the district court should have considered the extent of Moldova's reliance on Energoalliance's legal representations.

Our conclusion finds support from our decision in *Leidos*. There, a defense contractor, Leidos, won confirmation of a foreign arbitration award against a foreign state, Greece, and thrice requested that the award be denominated in euros. *See* 881 F.3d at 219. But after a judgment was rendered in euros, Leidos successfully moved under Rule 59(e) to convert the

award to U.S. dollars. *Id.* at 215. Leidos's about-face made it impossible for Greece to protect itself against the risk of exchange rate fluctuations by purchasing hedges. *Id.* at 219. Because the "parties' contract was in euros, the arbitral award was in euros and Leidos repeatedly requested judgment in euros," we said that Greece had "a reasonable and settled expectation that it would satisfy the judgment against it in euros." *Id.* (internal quotations omitted).

The district court declined to apply *Leidos* on the ground that the petitioner there did not request conversion until *after* the district court's judgment, whereas Komstroy requested conversion *before* judgment. This distinction is accurate, as far as it goes. A Rule 59(e) motion—which is filed after judgment—is proper if there is a need to correct a "manifest injustice." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam) (internal quotations omitted). *Leidos* held that there could be no manifest injustice if the petitioner obtained an arbitration award in euros and requested a judgment in euros, but later changed its mind. *See* 881 F.3d at 218. Strictly read, *Leidos* is more about Rule 59(e) motions than the district court's discretion to choose a currency denomination in the first instance.

But the underlying logic of *Leidos* is applicable. The fact that the petitioner requested an award in dollars *after* the judgment was important because it determined the procedural device used to make the request and the standard by which that request was evaluated. *Leidos* did not, however, imbue *judgment day* with a metaphysical significance in which converting a judgment to U.S. dollars is proper if the request is made pre-judgment and improper if made post-judgment. The equitable consideration in *Leidos* was that the petitioner unfairly delayed his request, disrupting the settled expectations of the other party. Here, the district court should have

considered whether Energoalliance took any actions that created a settled expectation on Moldova's part.

Energoalliance took at least two such actions. *First*, as the arbitral tribunal made clear, Energoalliance requested an award in U.S. dollars and then changed its mind and requested the award in Moldovan lei:

> Originally, the Claimant denominated its claim (both with regard to the principal debt and the interest) in US dollars. However later, it changed its demands in its Alternative Calculation Statement by denominating the amounts in [lei]. . . . As far as the Arbitration Court understands, the Claimant's argument is that any payments of Moldtranselectro to the Claimant would be made in lei (in case of monetary form of payments) therefore the most accurate measurement of the Claimant's loss would be denominated in lei.

*Second*, Energoalliance's November 2014 confirmation petition in district court denominated the bulk of requested relief in lei. Energoalliance's first request for a dollar-denominated award came in December 2018, more than five years after its first request for an award in lei and more than four years after its second such request.

We believe the district court wrongly focused on the most recent request for dollars, noting only that granting dollar conversion requests is "standard practice." Allowing this standard practice to override Moldova's reliance interest lets an arbitration winner make a riskless bet on the foreign exchange market—always requesting the initial award in local currency and then, during the course of U.S. confirmation

proceedings, seeking a dollar judgment if and only if the local currency suffers relative depreciation.

As the district court recognized, the Moldovan lei had depreciated significantly since the arbitral award was issued on October 25, 2013. At the time of the arbitral award, the currency exchange rate of lei to dollars was 12.9207 lei to 1 dollar. As of the date of the district court's order, the rate was 17.8856 lei to 1 dollar. Thus, the Moldovan lei depreciated nearly 30 per cent over the relevant period. But neither Stileks nor the district court explained why Moldova alone should bear the cost of currency depreciation. In sum, we conclude the district court inadequately accounted for the reliance interests Moldova may have reasonably developed based on Energoalliance's actions during arbitration.

For the foregoing reasons, we affirm the district court's November 13, 2018, stay-lifting order, as well as the portion of the August 23, 2019, order confirming the arbitral award and awarding prejudgment interest. However, the district court should have considered whether Moldova had a settled expectation that the award would be paid in Moldovan lei. Thus, we vacate the October 2, 2019, order entering judgment against Moldova in the amount of $58,591,058.50. On remand, the district court should evaluate Moldova's reliance interest, if any, that may have been created by Energoalliance's requests for a lei-denominated award. In light of our remand, we do not reach Moldova's argument regarding the district court's continuing jurisdiction *vel non* based on Moldova's appeal notice.

*So ordered.*