# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 25, 2024      Decided September 23, 2025

No. 23-7169

MARSEILLE-KLINIKEN AG,
APPELLEE

v.

REPUBLIC OF EQUATORIAL GUINEA,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-03572)

———

*Malik Havalic* argued the cause for appellant. With him on the briefs were *Michael A. DeBernardis* and *Carter Rosekrans*. *Shayda Vance* entered an appearance.

*Paul D. Schmitt* argued the cause for appellee. With him on the brief was *Mary E. Gately*.

Before: KATSAS, *Circuit Judge*, and GINSBURG and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

2

KATSAS, *Circuit Judge*:  Marseille-Kliniken AG, a Swiss company, obtained an arbitral award against the Republic of Equatorial Guinea arising from a contractual dispute in that country.  In the arbitration, the parties contested whether the dispute-resolution clause in the contract required Marseille-Kliniken to exhaust local remedies in Equatoguinean courts before proceeding to international arbitration in Switzerland. The arbitral panel construed the clause not to require such exhaustion.

Marseille-Kliniken moved to confirm the award in our district court.  The court held that the arbitration exception to the Foreign Sovereign Immunities Act conferred jurisdiction despite the parties' dispute over the meaning of the arbitration clause.  On the merits, the court deferred to the arbitrators' construction of the clause.  We agree with the jurisdictional ruling, but we disagree with the court's deferential approach on the merits.

I

A

The Foreign Sovereign Immunities Act (FSIA) makes foreign sovereigns "immune from the jurisdiction of the courts of the United States" unless a specific FSIA exception applies. 28 U.S.C. § 1604.  One such exception covers petitions "to confirm an award made pursuant to … an agreement to arbitrate," if "the agreement or award is or may be governed by" a United States treaty "calling for the recognition and enforcement of arbitral awards."  *Id*. § 1605(a)(6)(B).

A party seeking to confirm an arbitral award under this exception bears the initial burden of production to show "three jurisdictional facts": (1) an agreement to arbitrate, (2) an arbitral award, and (3) a treaty potentially governing its

enforcement. *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1100 (D.C. Cir. 2024) (quoting *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 204 n.2 (D.C. Cir. 2015) (cleaned up)).  If a private party satisfies this burden, the foreign sovereign bears the burden of persuasion to show that the arbitration exception does not apply.  *See id.*

B

The Federal Arbitration Act (FAA) provides for the confirmation of arbitral awards—that is, conversion of the awards into enforceable legal judgments.  *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 875 (D.C. Cir. 2021).

The FAA addresses enforcement of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which is commonly known as the New York Convention.  *See* 9 U.S.C. §§ 201–08 (FAA); 21 U.S.T. 2517 (1958) (New York Convention).  The Convention "is a multilateral treaty that requires signatory nations like the United States to honor the results of international arbitrations that comply with the treaty."  *Republic of Argentina v. AWG Grp. Ltd.*, 894 F.3d 327, 332 (D.C. Cir. 2018).  The Convention governs the "enforcement of arbitral awards" made in another sovereign state.  N.Y. Convention art. I.1.

The FAA requires federal courts to confirm such awards unless one of the grounds for refusal in the New York Convention is present.  9 U.S.C. § 207.  As relevant here, the Convention permits a court to refuse enforcement if the award addresses a dispute "not falling within the terms of the submission to arbitration."  N.Y. Convention art. V.1(c).  The grounds for refusal "are tightly construed, and the burden is placed on the party opposing enforcement."  *Diag Hum. S.E. v. Czech Republic – Ministry of Health*, 907 F.3d 606, 609 (D.C. Cir. 2018).

4

C

In 2009, Swiss healthcare provider Marseille-Kliniken AG contracted with Equatorial Guinea to modernize and eventually run a medical clinic in that country.  At some point, the parties' relationship soured.  Equatorial Guinea claimed that Marseille-Kliniken was unqualified to perform the necessary work.  Marseille-Kliniken responded that the state simply wanted to renege on the contract.  Regardless, all agree that Equatorial Guinea refused to let the company run the clinic after it had spent money and time modernizing it.

Marseille-Kliniken initiated arbitration in Switzerland.  The arbitrators ruled for the company and awarded damages.  The parties later settled this aspect of their dispute.

Marseille-Kliniken then initiated a second arbitration in Switzerland to recover other damages.  Equatorial Guinea contested the arbitrators' jurisdiction.  It claimed that the contract's dispute-resolution clause barred the company from proceeding to international arbitration without first seeking relief in the Equatoguinean courts.

Like the rest of the agreement, the dispute-resolution clause appears in both Spanish and German.  The arbitrators credited, and the parties accept, the following translations from these languages:

| Spanish Version | German Version |
| --- | --- |
| In the event of disputes[,] the Parties will meet and solve the problem amicably, otherwise they will turn to the Court of Equatorial Guinea.  If one of the parties | In the event a dispute should arise from this contract the Parties shall attempt to find an amicable solution prior to calling upon the Courts in Equatorial Guinea.    In the |

| does not agree, the Court of the Chamber of Commerce in Zürich may be called upon. | event disputes should arise, the Parties agree to engage in Arbitration Proceedings before the Chamber of Commerce in Zürich. |
| --- | --- |

J.A. 102–03. Both translations state that the parties should first attempt to resolve any disputes amicably. Both provide for arbitration if a dispute cannot otherwise be resolved. And both reference litigation in the Equatoguinean courts.

In contesting the arbitrators' jurisdiction, Equatorial Guinea invoked this contractual reference as well as background principles of customary international law. Typically, an entity wronged by a foreign sovereign must pursue remedies in the sovereign's domestic courts before resorting to international arbitration. *See Interhandel (Switz. v. U.S.)*, 1959 I.C.J. 6, 27 (Mar. 21) ("The rule that local remedies must be exhausted before international proceedings may be instituted is a well-established rule of customary international law."); Restatement (Third) of the Foreign Relations Law of the United States Part VII, intro. note & § 713 cmt. f (A.L.I. 1987) (Third Restatement); C. Dugan et al., *Exhaustion of Local Remedies*, *in* Investor-State Arbitration 347–48 (2008) (Dugan). Equatorial Guinea argued that the agreement codified this background rule, requiring Marseille-Kliniken to exhaust its remedies in Equatoguinean courts before resorting to arbitration in Switzerland.

The arbitral panel rejected this jurisdictional objection. It focused on the second sentence in the translations above. The Spanish version provides for arbitration if one party "does not agree." J.A. 103. The German version provides for arbitration if "disputes should arise." *Id.* at 102. The panel found the clause ambiguous on whether these terms refer to disagreement

6

with the merits of a decision by the Equatoguinean courts or with sending a dispute to those courts at all. *Id.* at 105–06. The panel concluded that the second interpretation "makes more sense"—if a party disagrees with submitting the dispute to the local courts, it may pursue international arbitration. *See id.* at 106. The arbitrators reasoned that, under Equatorial Guinea's interpretation, either a decision by its domestic courts would preclude arbitration or there could be conflicting "enforceable decisions in the same case." *Id.* On the merits, the panel again ruled for Marseille-Kliniken and awarded it over $9 million in damages.

Marseille-Kliniken filed a petition to confirm the award in our district court. The court held that it had subject-matter jurisdiction under the FSIA's arbitration exception. *Marseille-Kliniken AG v. Republic of Equatorial Guinea*, No. 20-cv-3572, 2023 WL 8005153, at *2 (D.D.C. Nov. 17, 2023). The court then held that the Supreme Court's decision in *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25 (2014), required it to defer to the arbitrators' interpretation of the dispute-resolution clause. Under *BG Group*, we presume that the parties to an arbitration agreement want courts to decide questions of "arbitrability," but want arbitrators to decide questions regarding "procedural preconditions" for arbitration. *See id.* at 33–35. The district court held that the dispute-resolution clause here fell into the latter category, so it deferred to the arbitrators' construction of it and confirmed the award. *Marseille-Kliniken*, 2023 WL 8005153, at *3.

Equatorial Guinea appealed.

II

Equatorial Guinea first argues that the district court lacked subject-matter jurisdiction under the FSIA. We consider that question *de novo*. *See Stileks*, 985 F.3d at 879. Recall that

Marseille-Kliniken bore the initial burden to produce evidence regarding three jurisdictional elements: an arbitration agreement, an arbitral award, and a potentially applicable treaty. *NextEra*, 112 F.4th at 1100. It easily cleared that hurdle. The company produced its agreement with Equatorial Guinea, which contains the dispute-resolution clause, and the Swiss arbitral award. It also argued that the New York Convention governs because the company obtained its award in Switzerland, a signatory country. In response, Equatorial Guinea disputes only the first jurisdictional element—whether the parties formed an agreement to arbitrate.

The FSIA requires "an agreement made by the foreign state with or for the benefit of a private party to submit" disputes to arbitration. 28 U.S.C. § 1605(a)(6). In assessing whether this requirement is met, we focus on the "existence" of an arbitration agreement, rather than on disputes about its "scope." *NextEra*, 112 F.4th at 1101. In other words, to succeed in a jurisdictional challenge, "the sovereign must attack the existence or validity of the arbitration agreement," not merely argue that it is inapplicable to a particular dispute. *Id.*

Equatorial Guinea contends that the dispute-resolution clause required Marseille-Kliniken to seek redress in its courts before pursuing arbitration. The parties agree that any decision in those courts would preclude arbitration of Marseille-Kliniken's claims for breach of contract. But that would not have foreclosed arbitration altogether. As Equatorial Guinea sees it, the losing party in the Equatoguinean courts could have sought to arbitrate international-law claims for a denial of justice. Under international law, a foreign investor may claim that a sovereign's domestic courts failed to afford it procedural fairness. *See* Third Restatement § 711 cmt. a. In other words, the denial-of-justice claim posited by Equatorial Guinea would

arise not from the merits of the underlying dispute, but from how the Equatoguinean courts adjudicated it. So, Equatorial Guinea's argument about the dispute-resolution clause concerns the scope of the arbitration agreement, not its existence. It thus fails to defeat subject-matter jurisdiction.

Equatorial Guinea also argues that the dispute-resolution clause is invalid because neither its law nor Swiss law allows parties to submit disputes to arbitration in the first instance. But arguments that an arbitration agreement violates domestic law are merits defenses under the New York Convention—not jurisdictional defenses under the FSIA. *See NextEra*, 112 F.4th at 1103–04; New York Convention art. V.1(a).

III

On the merits, the district court held that *BG Group* required it to defer to the arbitrators' construction of the dispute-resolution clause. We respectfully disagree.

A

The dispute in *BG Group* arose after BG Group plc, a British firm, acquired an Argentine gas company. *See* 572 U.S. at 29. At the time of the acquisition, Argentine law required gas tariffs to be calculated in dollars and set at levels to assure investors of a reasonable return. *See id.* Later, Argentina enacted new laws requiring the tariffs to be calculated in pesos, which caused BG to incur substantial losses. *See id.* at 29–30.

BG claimed that Argentina's conduct violated a bilateral investment treaty between the United Kingdom and Argentina. The treaty incorporated background norms of customary international law, including a requirement of fair and equitable treatment and a prohibition of uncompensated expropriation. Agreement for the Promotion and Protection of Investments,

Dec. 11, 1990, 1765 U.N.T.S. 34, 35–36. The treaty also contained an arbitration clause governing investment disputes "which arise within the terms of this Agreement"—*i.e.*, disputes arising under the treaty. *Id.* at 37–38. The clause required an aggrieved investor to raise such claims in the domestic courts of the offending government. *Id.* It permitted the aggrieved investor to pursue international arbitration if it was unsatisfied with the "final decision" of the domestic courts or if no such decision was made within eighteen months. *Id.* at 38. And it provided that the ensuing "arbitration decision shall be final and binding on both Parties." *Id.*

BG initiated arbitration against Argentina without first seeking relief in the Argentine courts. It claimed that Argentina's new law violated the treaty provisions requiring fair and equitable treatment of foreign investors and prohibiting uncompensated expropriation. 572 U.S. at 30. Argentina objected that the arbitral panel lacked jurisdiction because BG had failed to pursue domestic remedies before initiating arbitration. *Id.*

The arbitral panel rejected Argentina's contention. It concluded that certain Argentine laws, which made it difficult for foreign investors to litigate in its domestic courts, "implicitly excused compliance with the local litigation requirement." 572 U.S. at 31. These included laws staying the effect of Argentine court judgments and imposing legal disabilities on investors who filed claims under the treaty. *See id.* at 30–31. After excusing the failure to exhaust, the arbitrators ruled for BG on the merits. *Id.* at 31.

When BG sought to confirm the award, Argentina again raised its exhaustion objection. The Supreme Court framed its analysis around the question "who—court or arbitrator" should decide questions related to arbitrability. 572 U.S. at 32. The

Court explained that parties to an arbitration agreement may decide what questions to commit to the arbitrators. *Id.* at 33–34. The Court framed two competing presumptions to help discern the parties' intent if the relevant agreement is silent or ambiguous. *Id.* On the one hand, "courts presume that the parties intend courts, not arbitrators" to resolve substantive "disputes about arbitrability." *Id.* at 34 (cleaned up). On the other hand, "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration." *Id.* The Court explained that such procedural provisions include "time limits, notice, laches, estoppel, and other conditions" that determine "*when* the contractual duty to arbitrate arises, not *whether* there is a contractual duty to arbitrate at all." *Id.* at 35 (cleaned up). In contrast, provisions that specify "whether [the arbitration] may occur or what its substantive outcome will be on the issues in dispute" are substantive ones presumptively for courts to interpret and apply. *Id.* at 35–36. So too are provisions about "whether th[e] arbitration clause covers a certain kind of dispute" or those having a "direct impact" on its resolution. *Id.* at 42.

Applying this distinction, the Court held that the investment treaty's local-litigation provision was a mere procedural precondition to be construed by arbitrators. 572 U.S. at 35–36. According to the Court, the provision neither determined whether the arbitration clause covered a certain kind of dispute nor had any bearing on its outcome. *Id.* at 35–36, 42. In particular, the Court noted that the treaty itself made the arbitrators' decision—not the earlier decision of the domestic courts—"final and binding." *See id.* at 42. Because the exhaustion requirement thus had no substantive effect on the outcome of arbitration, it was merely "a claims-processing rule" for the arbitrators to construe. *Id.*

11

B

The local-litigation provision here functions as more than just a claims-processing rule. As explained above, the exhaustion requirement in *BG Group* appeared in a *treaty* codifying fair-treatment and just-compensation rules that arise under public *international* law. In contrast, the local-litigation provision here appears in a *contract* between Equatorial Guinea and one particular investor, which would be governed by the *domestic*, private law of one relevant sovereign. *See* Third Restatement § 712 cmt. h (state-investor contracts are typically assessed "under applicable national law" rather than international law). Perhaps the law of Equatorial Guinea would apply, because the contract involved the management of a hospital in Equatorial Guinea. Or perhaps Swiss law would apply, because the dispute-resolution provision called for arbitration in Switzerland. Either way, the local-litigation provision implicates contract claims arising under domestic law, not international claims that arise from treaties or custom.

This distinction is important. International tribunals are best situated to resolve international claims, which is perhaps why the investment treaty in *BG Group* made the arbitral decision "final and binding." *See* 572 U.S. at 42. And it is perhaps why, in *BG Group*, the Court stressed that the arbitrators "need not give weight to the local court's decision" on the international claims at issue. *Id.* Here, in contrast, both parties agree that any resolution of the contract claims by the domestic courts of Equatorial Guinea would bind the Swiss arbitral forum as to those claims. Instead, Marseille-Kliniken could pursue before the arbitrators only international claims keyed to any gross abuse in how the domestic courts handled the domestic claims before them. As noted above, international

law has long recognized such claims for "denial of justice." *See* Third Restatement § 711 cmt. a.[1]

Given this interplay between contractual and international claims, the local-litigation provision here has substantive import. Without it, Marseille-Kliniken could freely present to the arbitrators its breach-of-contract claims, as would normally occur for contract claims governed by arbitral agreements between private parties. But a decision by the Equatoguinean courts on the contract claims would simultaneously preclude arbitration on the contract claims and possibly create international claims for denial of justice. The provision thus bears not only on *when* the parties may arbitrate, but also on *what claims* they may submit to the arbitrators. Under *BG Group*, such a provision bears on substantive arbitrability, and is thus presumptively for courts to construe. *See* 572 U.S. at 35–36, 42.

Another aspect of *BG Group* reinforces this conclusion. Recall that Argentina had enacted laws hindering access to its domestic judiciary, leading the arbitral panel to excuse compliance with an exhaustion requirement that applied by its terms. *See* 572 U.S. at 30–31. In deferring to that decision, *see*

---

[1] *See also Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 783 n.11 (D.C. Cir. 1984) (per curiam) (Edwards, J., concurring) (noting that a party bringing such a claim could argue "corruption, threats, unwarrantable delay, flagrant abuse of judicial procedure, a judgment dictated by the executive, or so manifestly unjust that no court which was both competent and honest could have given it" (cleaned up)); Borchard, *The "Minimum Standard" of the Treatment of Aliens*, 38 Mich. L. Rev. 445, 460 (1940) (a party could argue denial of "[f]air courts, readily open to aliens, administering justice honestly, impartially, without bias or political control"); *The Denial of Justice Standard in International Law*, 97 Am. J. of Int'l L. 438, 439 (Murphy ed., 2003) (similar).

*id.* at 45, the Court effectively concluded that BG had established at least a colorable case for applying a futility exception to exhaustion that is well-recognized in international law. *See*, *e.g.*, Third Restatement § 713 cmt. f; Dugan 352. Here, no such exception would colorably apply, as Marseille-Kliniken does not contend that Equatorial Guinea has imposed any impediments on its ability to litigate contract claims in the domestic courts of that country.

C

Nothing in the contract between Marseille-Kliniken and Equatorial Guinea rebuts the presumption that courts should decide threshold questions of arbitrability. Such threshold questions include deciding whether the parties have satisfied any preconditions for arbitration. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67–68 (2019).

To delegate threshold arbitrability questions to arbitrators, parties must do so "clearly and unmistakably." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (cleaned up); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). This Court has held that such a clear and unmistakable delegation can exist where the arbitration agreement incorporates a set of rules authorizing the arbitrators to determine arbitrability. For example, it can be enough to incorporate the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL), which provide that the "arbitral tribunal shall have the power to rule on its own jurisdiction." *See Stileks*, 985 F.3d at 878–79; *Chevron*, 795 F.3d at 207–08. On the other hand, enlisting the American Arbitration Association "for help in choosing a successor arbitrator" is not enough, even though AAA rules authorize the arbitrators to determine arbitrability. *See Dist. No. 1 Pac. Coast Dist. Marine Eng'rs' Beneficial Ass'n AFL-*

*CIO v. Liberty Mar. Corp.*, 998 F.3d 449, 461–62 (D.C. Cir. 2021). As we explained, the "mention of the AAA … does not embody an incorporation of [its] rules, let alone a clear and unmistakable incorporation." *Id.* at 462.

In this case, nothing in the dispute-resolution clause delegates arbitrability questions to arbitrators. Marseille-Kliniken urges a delegation because the dispute-resolution clause authorized arbitration before the Zurich Chamber of Commerce, which presumptively uses the Swiss Chambers' Arbitration Rules, and those rules authorize arbitrators to determine arbitrability. That would be a strong argument if the Zurich Chamber were legally bound to use the Swiss Rules; for instance, a contractual venue clause requiring adjudication in a specific district court surely would entail the use of that court's local rules. But nothing binds arbitration services to use any particular set of rules. To the contrary, Swiss law allows the parties to "agree on individual rules tailored to their specific case, on institutional arbitration rules, on independent arbitration rules (e.g. UNCITRAL Arbitration Rules) or on national procedural law." Swiss Priv. Int'l L. Act (Ch. 12), art. 182 at 931, https://perma.cc/ZAW7-VM44. And the "arbitral tribunal's authority to determine the procedure is subsidiary to the parties' agreement." *Id.* So, enlisting the services of the Zurich Chamber of Commerce says little about what specific procedural rules would govern any individual arbitration. Indeed, in this very case, the arbitrators did not fix the governing procedural rules until a procedural order entered in December 2015. *See* J.A. 549.

Marseille-Kliniken argues that Equatorial Guinea forfeited its current argument by not specifically objecting to use of the Swiss Rules at an initial procedural meeting. But it is Marseille-Kliniken's burden to show that the dispute-resolution clause clearly and unmistakably delegated

arbitrability decisions. *See First Options*, 514 U.S. at 944–46. Moreover, Equatorial Guinea repeatedly argued to the arbitrators that the arbitral panel lacked jurisdiction to decide anything unless and until Marseille-Kliniken exhausted its remedies in Equatoguinean courts. That objection subsumes the narrower, subsidiary objection that the arbitral panel should not have the sole and final word on the specific question of exhaustion.

\*   \*   \*   \*

In sum, the district court erred in deferring to the arbitral panel's construction of the dispute-resolution clause.

IV

Equatorial Guinea asks us to interpret the clause ourselves and hold that it requires exhaustion. We decline to do so. Like the Supreme Court, "we are a court of review, not of first view," so we ordinarily do not decide contested questions not resolved below. *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005). And we should particularly avoid doing so here, where the merits may require factfinding or may turn on unfamiliar questions of Equatoguinean or Swiss law.

One significant question involves determining what law should govern interpretation of the dispute-resolution clause. Perhaps the law of Equatorial Guinea because the contract required, and the dispute involved, primary conduct occurring almost entirely in that country. Perhaps Swiss law, because the parties opted for arbitration in Switzerland. Perhaps even United States law, given the Supreme Court's choice in *BG Group* to apply "presumptions supplied by American law" in addressing a dispute arising almost entirely in Argentina. *See* 572 U.S. at 37. The contract does not contain a choice-of-law clause, and the parties did not brief this issue.

Beyond the choice-of-law question lie substantive questions regarding what interpretive principles should govern. The arbitrators here concluded that the dispute-resolution clause is ambiguous on the specific question whether exhaustion is required. If that is so, should the court just decide what reading of the governing text is most plausible? To what extent should it consider extrinsic evidence, like the testimony of Marseille-Kliniken's founder regarding his understanding of the contract? To what extent should domestic law seek to conform to any international-law norm favoring exhaustion of local remedies? The parties did not address these issues in any detail. Finally, should the court consider at all Equatorial Guinea's Foreign Investment Law, which requires exhaustion of local remedies for disputes arising from investment projects approved under that law? *See* J.A. 282–83. Equatorial Guinea contends that this law is dispositive. But at oral argument, neither party could tell us whether the agreement at issue here had been so approved.

Given the extent of uncertainty on these points, we think it best to remand for the parties to address these issues and the district court to resolve them in the first instance. We therefore vacate the district court's judgment and remand for further proceedings consistent with this opinion.

*So ordered*.