# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 4, 2025      Decided February 13, 2026

No. 25-7005

STABIL LLC, ET AL.,
APPELLEES

v.

RUSSIAN FEDERATION,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-00983)

———

No. 25-7064

JSC DTEK KRYMENERGO,
APPELLEE

v.

RUSSIAN FEDERATION,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cv-03330)

———

*Juan O. Perla* argued the cause for appellant Russian Federation. With him on the briefs were *Joseph D. Pizzurro* and *Kevin A. Meehan*. *Joseph Muschitiello* and *Sylvi Sareva* entered appearances.

*Marney L. Cheek* argued the cause for appellee JSC DTEK Krymenergo in case No. 25-7064. With her on the brief were *Amanda Tuninetti*, *Jill Warnock*, and *Hannah Hummel*.

*James H. Boykin III* argued the cause for appellee Stabil LLC, et al. in case No. 25-7005. With him on the brief were *John M. Townsend*, *Eleanor Erney*, *Shayda Vance*, *Carter Rosekrans*, and *Winthrop Jordan*.

Before: CHILDS and PAN, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

CHILDS, *Circuit Judge*: When Russia invaded Crimea in 2014, it did not arrive at an empty field. Ukrainian companies were already there, embedded in the daily life of the peninsula. Their businesses were lawful, visible, and stationary. Within months, Russian and Crimean forces seized facilities, transferred operations, and refused to provide compensation. In the cases before us, two sets of Ukrainian companies were affected ("Companies"). One is JSC DTEK Krymenergo ("DTEK"), an electricity distributor, and the other is a group of Ukrainian companies ("Investors") that owned and operated petrol stations across Crimea and lost those businesses.

The Companies turned to a bilateral investment treaty between Russia and Ukraine—the *Agreement Between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments* ("Investment Treaty"). The

Investment Treaty promised protection against uncompensated expropriation and offered arbitration to resolve disputes arising in connection with investments. The Companies, under that agreement, sued Russia in arbitral tribunals. Those arbitral tribunals concluded that Russia had breached the Investment Treaty and awarded damages to the Companies. The Companies thereafter sought to enforce these arbitral awards in the United States District Court for the District of Columbia.

In those district court proceedings, Russia acknowledged that the arbitrations occurred and that the tribunals issued the awards. It disputed, however, the authority of the district court to enforce them. In Russia's view, the Foreign Sovereign Immunities Act ("FSIA") did not afford jurisdiction because the Investment Treaty never covered investments in Crimea, the resulting awards are political rather than commercial, and the lack of minimum contacts with the United States bars the exercise of personal jurisdiction.

The district court rejected those arguments. It held in both cases that jurisdiction exists under the FSIA's arbitration exception and that personal jurisdiction follows once an FSIA exception applies and service is proper. Russia now brings these interlocutory appeals under the collateral order doctrine.

Our task is limited. We do not decide the sovereignty of Crimea. We do not revisit the merits of the arbitral awards. Instead, we decide whether the district court possessed jurisdiction to hear these enforcement petitions under the FSIA, and whether Russia—once the district court concluded that the FSIA's arbitration exception applied and service was proper—may nonetheless invoke the Fifth Amendment's Due Process Clause to defeat personal jurisdiction.

Having reviewed the record and the parties' briefs, we affirm the district court's judgments.

4

I

A

1

For more than a century and a half, the United States treated foreign sovereigns as immune from suit in its courts. That understanding begins with *The Schooner Exchange v. McFaddon,* 11 U.S. 116 (1812). Chief Justice Marshall recognized the breadth of territorial jurisdiction—"susceptible of no limitation not imposed by itself"—but explained that the United States had chosen not to exercise that power in certain cases involving foreign sovereign acts. *Id.* at 136. The holding was modest: a foreign warship in an American port lay beyond judicial reach. But that reasoning traveled. Courts soon read *The Schooner Exchange* opinion as endorsing near-absolute immunity for foreign states. *See Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562, 574 (1926) (reasoning that foreign sovereign immunity applied to "all ships held and used by a government for a public purpose"); *see also* Robert B. von Mehren, *The Foreign Sovereign Immunities Act of 1976*, 17 Colum. J. Transnat'l L. 33, 39 (1978) (noting that *The Schooner Exchange* "doctrine remained largely unchallenged").

*The Schooner Exchange* decision also anchored the doctrine's foundation. Sovereign immunity does not flow from the Constitution; it rests on "grace and comity." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983) (discussing *The Schooner Exchange*). Because immunity reflects a choice, not a constitutional command, courts historically deferred to the political branches—especially the Executive—when deciding whether to hear suits against foreign states and their instrumentalities. *See, e.g.*, *Ex parte Republic of Peru*, 318 U.S. 578, 586–87 (1943) ("The case involves the dignity and

rights of a friendly sovereign state, claims against which are normally presented and settled in the course of the conduct of foreign affairs by the President and by the Department of State."); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 34 (1945) (reasoning that foreign sovereign immunity is "founded upon the policy recognized both by the Department of State and the courts that the national interests will be best served when controversies growing out of the judicial seizure of vessels of friendly foreign governments are adjusted through diplomatic channels rather than by the compulsion of judicial proceedings"). That deference tracked prevailing international norms, which we later described as the "general concepts of international practice." *In re Grand Jury Subpoena*, 912 F.3d 623, 626 (D.C. Cir. 2019) (quoting Michael Wallace Gordon, *Foreign State Immunity in Commercial Transactions* § 3.01 (1991)).

By 1952, the ground had shifted. Foreign states no longer confined themselves to diplomacy and defense; they entered markets and engaged in "commercial activity in the United States." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 208 (2018). That reality, the State Department concluded, required a system that allowed private parties "doing business with them to have their rights determined in the courts." *Id.* (quoting J. Tate, Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments, 26 Dept. State Bull. 984, 985 (1952)). The State Department adopted this "'restrictive' theory of foreign sovereign immunity," advising courts to grant immunity for public acts but to withhold it in disputes arising from a foreign state's "strictly commercial acts." *Verlinden*, 461 U.S. at 487.

Congress codified that approach in 1976. Through the FSIA, it preserved the historical respect owed to foreign sovereigns while insisting on accountability when they act as

6

market participants. *See* 28 U.S.C. § 1602 *et seq.* The statute largely embraces the "restrictive theory of sovereign immunity," translating Executive practice into governing law. *Verlinden*, 461 U.S. at 488.

2

These cases also implicate the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention" or "Convention"), opened for signature June 10, 1958, 21 U.S.T. 2517. Put simply, the Convention is a multilateral treaty among sovereigns that governs the "recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." New York Convention art. I(1). The United States is a signatory, and it applies the Convention "on the basis of reciprocity," limiting enforcement to awards rendered in the territory of "another Contracting State." *Id.* art. I(3). Congress implemented the Convention in Chapter 2 of the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. §§ 201–208.

When the United States ratified the Convention, it adopted a commercial reservation. *See* New York Convention art. I(3) (noting that the Convention only applies to legal relationships that are "considered as commercial"); *see also* 9 U.S.C. § 202 (same). The FAA then makes two points clear. First, any action "falling under the Convention" "arise[s] under the laws and treaties of the United States." 9 U.S.C. § 203. Second, the Convention reaches only arbitral awards arising from a "legal relationship, whether contractual or not," that the law "consider[s] as commercial." *Id.* § 202.

B

These consolidated appeals before us trace back to a single rupture, felt across different industries but anchored in the same place and time. In 2014, Russia moved into Crimea, a region internationally recognized as part of Ukraine. Within weeks, Russia asserted control and began reorganizing Crimea's economy. Ukrainian-owned businesses operating there—some supplying electricity, others fuel—were caught in the transition. What followed were seizures, nationalizations, and the effective transfer of private assets to Russian-controlled entities.

The legal framework governing those events is straightforward. In 1998, Russia and Ukraine executed the Investment Treaty designed to encourage cross-border investment. The Investment Treaty promised foreign investors fair and equitable treatment, protection against uncompensated expropriation, and access to arbitration for disputes arising in connection with covered investments. It applies to investments made by investors of one contracting party in the territory of the other and contains a standing offer by each signatory state to arbitrate qualifying disputes at the investor's election— either under the United Nations Commission on International Trade Law ("UNCITRAL") Rules or before designated arbitral institutions. When Russia entered Crimea in February 2014, the Investment Treaty remained in full force and effect.

At that time, Ukrainian companies had long operated substantial businesses in Crimea. Their operations were integrated into local markets and regulated under Ukrainian law. Russia's subsequent actions—formal annexation, extension of Russian law, and measures to seize or nationalize assets—were undertaken against that settled commercial landscape. For the Companies, the change was swift and

decisive. Crimean and Russian forces seized control of the Companies' facilities and, by decree, transferred their assets without compensation in one case.

DTEK's operations exemplified that reality. It ran an integrated electricity network serving hundreds of thousands of customers across Ukraine, supported by generation-related assets, transmission infrastructure, substations, equipment, licenses, and contractual rights. These investments were capital-intensive and immobile by design. The Investors' businesses differed in form but not in permanence. They owned and operated petrol stations throughout Crimea, relying on real property, storage facilities, fuel inventories, vehicles, branding, and local workforces.

Russia's response to these entrenched operations was not negotiation or compensation, but displacement. For DTEK, that displacement came through legislative acts and physical takeover. After Russia extended its law to Crimea, local authorities adopted measures transferring ownership of designated assets to the Republic of Crimea. DTEK's property was later added explicitly to the list. Uniformed personnel took control of facilities and denied company managers access.

The Investors experienced a similar fate through a more incremental process. Russian paramilitary forces seized petrol stations and offices, sold fuel inventories, and displaced management. Over time, Crimean authorities issued orders nationalizing the remaining stations and transferring operational rights to Russian state-owned entities. By 2016, the Investors' Crimean operations had been fully extinguished.

The Investment Treaty supplied the Companies' response. It promised arbitration as the means of enforcement when its protections were breached. The Companies invoked that mechanism. Their paths differed in timing and participation,

but their claims paralleled: Russia's actions in Crimea constituted unlawful expropriation and a breach of the Investment Treaty.

The Investors moved first. In June 2015, they initiated arbitration against Russia under the UNCITRAL Rules. Russia declined to participate. The tribunal proceeded nonetheless, addressing jurisdiction as a threshold matter and concluding that the Investors qualified as protected investors, their assets were covered investments, and the dispute fell within the Investment Treaty's arbitration clause.

Russia challenged that jurisdictional ruling in the Swiss Federal Supreme Court. That court rejected the challenge. The case returned to the tribunal, where it then proceeded to the merits and, in April 2019, issued a final award concluding that Russia had expropriated the Investors' assets without compensation and breached its Investment Treaty obligations. The tribunal awarded more than $34 million in damages. Russia's subsequent effort to set aside the award in Swiss court failed.

DTEK's arbitration followed a later but similar course. In February 2018, it commenced arbitration under the UNCITRAL Rules. Russia initially refused to participate but later entered the case and contested both jurisdiction and the merits. Russia argued that Crimea was not Russian territory and that the Investment Treaty therefore did not apply. The tribunal rejected those arguments, concluding that Russia exercised effective control over Crimea and that the Investment Treaty's territorial requirement was satisfied.

After full merits proceedings—including extensive briefing and a week-long evidentiary hearing—the tribunal issued its final award in November 2023. The tribunal concluded that Russia had expropriated DTEK's assets,

subjected it to discriminatory treatment, and failed to provide compensation or due process. It awarded approximately $208 million in damages. Russia has applied to set aside DTEK's award in the Hague Court of Appeal, and those proceedings remain pending.

Armed with final arbitral awards, the Companies turned to the United States District Court for the District of Columbia. Each filed a petition under the New York Convention, as implemented by the FAA, seeking confirmation of its award against the Russian Federation. The filings were separate and assigned to different judges. But the posture was the same—a foreign sovereign, an adverse arbitral award, and threshold challenges to federal jurisdiction.

The Investors filed first, in April 2022. Russia moved to dismiss, arguing that it remained immune under the FSIA, that no valid agreement to arbitrate existed, and that exercising personal jurisdiction would violate due process. The district court rejected those arguments. It concluded that the Investors had satisfied the FSIA's arbitration exception and that personal jurisdiction followed from subject-matter jurisdiction and proper service. *See Stabil LLC v. Russian Fed'n*, No. 1:22-CV-00983, 2024 WL 5093202, at *2–6 (D.D.C. Dec. 12, 2024). Although the district court deferred confirmation, it squarely held that it had jurisdiction to proceed. *See id.* at *6 ("Though a stay is unwarranted, so too is immediate confirmation of the award.").

DTEK's petition followed shortly after its final award issued. Russia again moved to dismiss, advancing the same jurisdictional theories. The district court rejected them. It held that DTEK had made a *prima facie* showing under the FSIA's arbitration exception and that Russia's arguments went to arbitrability and the merits, not jurisdiction. *See JSC DTEK*

*Krymenergo v. Russian Fed'n*, No. 1:23-CV-03330, 2025 WL 1148347, at \*4–6 (D.D.C. Apr. 17, 2025); *see also id*. at \*4 ("DTEK Krymenergo has met its initial burden of production by pointing to (1) the Ukraine-Russia BIT, (2) the arbitral award issued under that BIT, and (3) the New York Convention."). The district court also denied Russia's request for a stay, explaining that parallel foreign proceedings did not warrant delay under the New York Convention. *Id.* at \*7.

By the end of those rulings, the posture of both cases was clear. The district court, applying the same statutory framework and precedent, concluded that it possessed jurisdiction to adjudicate the Companies' petitions. The merits of enforcement remained unresolved. But the threshold jurisdictional questions—pressed by Russia at every turn—had been answered in the same way twice.

Invoking the collateral order doctrine, Russia seeks interlocutory review of both jurisdictional holdings. The appeals were docketed separately, briefed in parallel, and have now been consolidated before us.

II

A

We begin, as we must, with our appellate jurisdiction. Because Russia appeals the district court's judgements under the collateral order doctrine, we start there. This doctrine supplies a narrow alternative path to "appellate jurisdiction." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 532 F.3d 860, 864 (D.C. Cir. 2008) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)). It permits interlocutory review "only to a 'small class' of decisions" that conclusively resolve a disputed question, decide an important issue wholly separate from the merits, and would be effectively

unreviewable after final judgment. *Microsoft Corp. v. Baker*, 582 U.S. 23, 29 n.3 (2017) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)). The Supreme Court has repeatedly warned that the doctrine's scope is deliberately modest, and it has rebuffed efforts to enlarge that "small class" beyond its narrow and selective bounds. *Will v. Hallock*, 546 U.S. 345, 350 (2006); *see also Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994) ("[T]he narrow exception should stay that way and never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment." (citation modified)).

Here, we exercise our appellate jurisdiction "under the collateral order doctrine to review the denial of Russia's claim of sovereign immunity." *Hulley Enters. Ltd. v. Russian Fed'n*, 149 F.4th 682, 687 (D.C. Cir. 2025) (citation omitted). That conclusion follows from first principles. Sovereign immunity is not a defense to be weighed after the fact; it is an immunity from suit itself. And once a sovereign is required to litigate, the immunity—like the quiet it protects—is already lost. *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017) (explaining that foreign sovereign immunity's "basic objective" is "to free a foreign sovereign from suit" (citation omitted)).

When we take up a denial of immunity under the FSIA through the collateral-order doctrine, as we do here, our review does not necessarily stop there. We may also consider a foreign sovereign's challenge to personal jurisdiction under our pendent appellate jurisdiction, and we do so here. *See, e.g.*, *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997) (addressing a personal jurisdiction challenge vis-à-vis pendent appellate jurisdiction); *Helmerich*

*& Payne Int'l Drilling Co. v. Venezuela*, 153 F.4th 1316, 1325 (D.C. Cir. 2025) (same).

B

Our standard of review proceeds on settled ground. Whether an exception to sovereign immunity applies under the FSIA is a legal question, and we review it "de novo." *Zhongshan Fucheng Indus. Inv. Co. v. Fed. Republic of Nigeria* (*Zhongshan*), 112 F.4th 1054, 1061 (D.C. Cir. 2024). The same is true of the threshold questions that frame the arbitration exception: whether a qualifying arbitration agreement exists under 28 U.S.C. § 1605(a)(6), and whether a treaty potentially governs enforcement of the award. Those determinations, too, are reviewed "de novo." *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain* (*NextEra*), 112 F.4th 1088, 1099 (D.C. Cir. 2024). And because personal jurisdiction under the FSIA presents a legal question once the relevant facts are set, we likewise review that question "de novo." *Saint-Gobain Performance Plastics Eur. v. Bolivarian Republic of Venezuela*, 23 F.4th 1036, 1040 (D.C. Cir. 2022).

Any factual findings that bear on jurisdiction are reviewed for what they are—facts—and we disturb them only for "clear error." *Jungquist*, 115 F.3d at 1028 (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

III

Russia presses several arguments on appeal. It contends that the district court erred in denying immunity under the FSIA and in concluding that personal jurisdiction exists given, in its view, the protections of the Due Process Clause. We disagree. Properly understood, neither of Russia's contentions undermines the district court's subject-matter and personal jurisdiction.

14

A

The FSIA begins from a simple premise that foreign states are immune from suit in American courts. But that premise is not absolute. The Act sets out a series of carefully drawn exceptions, and when one applies, foreign sovereign immunity falls away. *See LLC SPC Stileks v. Republic of Moldova* (*Stileks*), 985 F.3d 871, 877 (D.C. Cir. 2021) (explaining that foreign states are "generally immune" under the FSIA, but that the Act "also established various exceptions" (citing 28 U.S.C. §§ 1604, 1605)); *see also Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 197 (2007) ("Under the FSIA, a foreign state is presumptively immune from suit unless a specific exception applies." (citing 28 U.S.C. § 1604; *Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993))). Those exceptions are not supplemental; they are exclusive. They provide the "sole basis for obtaining" subject-matter jurisdiction over a foreign state "in our courts." *Argentine Republic. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Russia invokes foreign sovereign immunity here. The Companies, for their part, seek enforcement of their respective arbitral awards under the FSIA's arbitration exception. The question before us is whether the Companies satisfy that exception.

In addressing this issue, the governing framework is well settled. In *NextEra*, we explained that the FSIA arbitration exception, 28 U.S.C. § 1605(a)(6), requires three jurisdictional facts: "(1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award enforcement." 112 F.4th at 1100. We "must independently confirm" each of those facts. *Hulley*, 149 F.4th at 687 (citation omitted). Once they are confirmed, the FSIA's arbitration exception is satisfied; questions about the reach, application, or merits of a treaty-based arbitration clause do not enter our jurisdictional inquiry.

15

*See NextEra*, 112 F.4th at 1101. The Companies bear the "initial burden" of establishing these jurisdictional facts. *Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015). And they have carried that burden.

B

We first address whether the Companies have shown the existence of an arbitration agreement. They have done so in the usual way by "producing the [Investment Treaty] and the notice of arbitration." *Chevron*, 795 F.3d at 205. Doing so is ordinarily enough. Russia nevertheless resists that conclusion. It argues that the Companies did not make investments in Russian territory because they invested in Crimea, which Russia insists remained part of Ukraine at the time. In Russia's view, the Investment Treaty's arbitration clause never extended to the Companies' investments, and Russia's subsequent control over Crimea did not transform them into covered ones under the treaty.

That argument is flawed. At bottom, Russia does not deny that the Investment Treaty exists or that it contains an agreement to arbitrate. In essence, Russia invokes a familiar but unavailing contention that the Investment Treaty "does not prove that it agreed to arbitrate this *particular* dispute," but only that it agreed "to arbitrate certain disputes" with Ukrainian investors. *Stileks*, 985 F.3d at 878. Our precedent forecloses that argument.

As we recently explained, "questions about whether an arbitration agreement covers a particular investment pertain to the scope of the agreement and are not jurisdictional." *Hulley*, 149 F.4th at 689 (citation omitted); *see also NextEra*, 112 F.4th at 1101 ("[D]isputes about the scope of an arbitration agreement, such as whether a binding arbitration agreement covers a particular dispute, are not jurisdictional questions

under the FSIA." (citation modified)). Russia's argument therefore fails because it turns on whether the Companies' investments fall within the scope of the Investment Treaty—not on whether an agreement to arbitrate exists at all.

The point is reinforced by how the FSIA's arbitration exception operates. It requires only that the arbitral tribunal "purported to make an award pursuant to the [Investment Treaty], not that it in fact did so." *NextEra*, 112 F.4th at 1104. Here, the tribunals concluded that the Investment Treaty supplied jurisdiction and held Russia liable for breaching it. That should end our jurisdictional inquiry. Russia nonetheless turns to first principles of contract law, and its asserted intentions when it signed the Investment Treaty, urging that no applicable arbitration agreement exists. That effort fares no better.

By pressing these arguments, Russia collapses two questions that our caselaw keeps distinct. One asks whether a dispute is arbitrable under the Investment Treaty. The other asks whether an arbitration agreement exists for purposes of the FSIA. The first goes to the scope and merits of the agreement; the second to jurisdiction. They are not the same and treating them as such does not make them so.

Russia's silence makes that point. It does not deny that it consented to arbitrate investment disputes in the Investment Treaty. It does not dispute that the treaty was in force at the relevant time. It does not claim that the agreement to arbitrate is void. Strip those points away, and nothing jurisdictional remains. What is left is a merits defense—one dressed up as a challenge to the court's jurisdiction to hear the case.

Russia's reframing does not cure the defect. It next insists that it never intended to agree to arbitrate for the benefit of particular investors—Ukrainian investors operating in Crimea.

But that contention merely repackages the same mistake.  It again confuses who ultimately prevails under the Investment Treaty with whether an agreement to arbitrate exists at all.  We have rejected this maneuver before, and repeatedly.

For example, in *NextEra*, Spain argued that the "standing offer to arbitrate contained in Article 26 of the ECT does not extend to EU nationals like the companies," but instead reaches only investors from non-EU signatories.  112 F.4th at 1103.  We rejected that contention because it "regard[ed] the *scope* of the Energy Charter Treaty, not its *existence*," and thus went only to "whether the ECT's arbitration provision applies to these disputes," not to whether an agreement to arbitrate existed in the first place.  *Id.*

Russia, however, argues that *NextEra* stood for the proposition that a party relying on an investment treaty to establish the existence of a relevant arbitration agreement under the FSIA must demonstrate that it belongs to the "class of private investors," 112 F.4th at 1102, that may invoke the benefits of the treaty.  Russia misreads that case.

There, we clarified that "[w]hen a sovereign makes 'an agreement . . . to submit to arbitration' by entering an investment treaty with other sovereigns 'for the benefit of' a class of private investors, it is the treaty that manifests the sovereign's consent to arbitrate."  *Id.* at 1102 (quoting 28 U.S.C. § 1605(a)(6)).  In doing so, we "look[ed] to the investment treaty itself to identify the scope of the *sovereign's consent* and the relevant agreement for purposes of the FSIA's arbitration exception."  *Id.* (emphasis added).  And while "a sovereign's consent to arbitration is important," "sovereigns can condition their consent to arbitrate by writing various terms into their bilateral investment treaties."  *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 43 (2014).

In addressing whether Spain consented to arbitration, we held that "[t]he investment treaty offer[ed] powerful reasons to conclude that the standing offer to arbitrate contained in the ECT's arbitration provision extends to EU nationals." *NextEra*, 112 F.4th at 1102. That was because "[t]he clear terms of the ECT's arbitration provision cover disputes between a Contracting Party and an investor of another Contracting Party." *Id.* (citation modified). And in short order, we concluded that Spain was clearly a "Contracting Party" and the companies were "undeniably Investor[s] of another Contracting Party," because those companies were "organized in accordance with the law applicable in the Netherlands or Luxembourg." *Id.* (internal quotation marks omitted).

Here, the Investment Treaty leaves little room for doubt. It covers "[a]ny dispute between one Contracting Party and an investor of the other Contracting Party arising in connection with investments." No. 25-7064, J.A. 236. Russia is indisputably a "Contracting Party." *Id.* And the Companies are "investor[s] of a Contracting Party," because they are "legal entit[ies] constituted in accordance with the legislation in force in [Ukraine]." No. 25-7064, J.A. 233; *see also* 25-7064, J.A. 376 (noting that DTEK is "a Ukrainian energy supplier"); 25-7064, J.A. 383 (observing that Russia refers to DTEK as "a Ukrainian entity"); 25-7005, J.A. 183 (explaining, in the Notice of Arbitration, that the Investors are "eleven companies organized under the laws of Ukraine"). On that much, the Investment Treaty's text—and the record—are clear.

Russia's objection begins only with the definition's second clause, which requires that the "legal entity" be "competent" to make investments "in the territory of the other Contracting Party." No. 25-7064, J.A. 233. But even there, Russia does not argue that the Companies would generally fall outside the Investment Treaty's definition of an investor. It instead

advances a narrower contention that because the Companies' investments were in Crimea, the Investment Treaty's arbitration clause does not apply here.

As mentioned, that argument reprises a familiar refrain. As in *NextEra*, "[i]t does not matter *why* the [Investment Treaty] may not apply to the dispute." 112 F.4th at 1104 (citation modified). The reason is decisive that "[w]hether the [Investment Treaty] applies to [a] dispute is not a jurisdictional question under the FSIA." *Id.* at 1103 (citation modified). Questions about territorial reach and treaty coverage go to the scope of the agreement—to arbitrability—not to the existence of consent. For jurisdictional purposes, that is the end of the matter. The Companies therefore "showed [Russia]'s agreement to arbitrate" within the meaning of the FSIA by "produc[ing] copies of the [Investment Treaty]." *Id.* (quoting *Stileks*, 985 F.3d at 877). *NextEra* aside, we have rejected in other cases similar arguments to Russia's.

*Hulley*, for instance, followed the same path. There, Russia pointed to treaty language "provid[ing] for settlement of disputes between a Contracting Party and an Investor of another Contracting Party," and argued that the claimants— though formally organized abroad—were controlled by Russian nationals and therefore not investors "of another Contracting Party." *Hulley*, 149 F.4th at 690 (internal quotation marks omitted). We rejected that argument as well, holding that "[o]ur decision in *NextEra* squarely foreclose[d] Russia's argument." *Id.*

So too in *Chevron*. Ecuador insisted that if Chevron's claims fell outside the treaty, "then Ecuador never agreed to arbitrate with Chevron," and the district court therefore lacked subject-matter jurisdiction. *Chevron*, 795 F.3d at 205. All that the FSIA requires of the petitioner for jurisdictional purposes

is a *prima facie* showing of the existence of an agreement to arbitrate, which the foreign sovereign then must rebut. *Id.* Ecuador's only response was that it did not agree to arbitrate this agreement, not that no agreement to arbitrate existed at all. *Id.* We declined that invitation. The argument failed because it mistook a question of scope for a defect of jurisdiction.

*Stileks* drove the point home. There, Moldova argued that the Energy Charter Treaty did not give the arbitral tribunal jurisdiction over the dispute and that "the resulting award was not 'made pursuant to such an agreement to arbitrate.'" *Stileks*, 985 F.3d at 877 (quoting 28 U.S.C. § 1605(a)(6)). It elaborated that although the treaty "may establish that Moldova agreed to arbitrate certain disputes," it did not agree "to arbitrate this *particular* dispute." *Id.* at 878. We answered directly that "the arbitrability of a dispute is not a jurisdictional question under the FSIA." *Id.* (citation omitted). From that premise followed the conclusion we have repeated many times since—"[t]he FSIA's arbitration exception therefore applies," rejecting Moldova's immunity claim. *Id.*

Just as we did in those cases, we reject Russia's argument here because it goes to the scope of the arbitration agreement and not its existence. Again, Russia does not dispute that it has entered into an arbitration agreement by signing the Investment Treaty with Ukraine. It only disputes that the Investment Treaty does not apply to the Companies' investments. That is a textbook defense against the arbitrability of these disputes, not the existence of the agreement.

For these reasons, we hold that the Companies have satisfied the first element of the FSIA's arbitration exception.

21

C

There is no genuine dispute whether the arbitral tribunals issued arbitral awards—the second element of FSIA's arbitration exception. The record confirms that awards were issued, and Russia does not contend otherwise. Still, because the inquiry is jurisdictional, we do not proceed on these concessions alone. As discussed above, we "must independently confirm," *Hulley*, 149 F.4th at 687 (citations omitted), whether the tribunals issued arbitral awards.

In DTEK's arbitration proceeding, the tribunal awarded DTEK roughly $208 million. And in the Investors' arbitration proceeding, the respective tribunal awarded them more than $34 million in damages. Those awards settle the issue. *See id.* at 688 n.3 (holding that the second element of the FSIA's arbitration exception was satisfied because "[t]he [t]ribunal awarded the [s]hareholders $50 billion in damages" (citation omitted)). Thus, we hold that the Companies have satisfied the second element of the FSIA's arbitration exception.

D

With the first two elements of the FSIA arbitration exception established, we address whether the New York Convention potentially governs the awards. Russia says no. In its view, the awards are political awards and falls outside the Convention's ambit, relying on *Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F. Supp. 1, 13 (S.D.N.Y. 1973), *aff'd*, 489 F.2d 1313 (2d Cir. 1974). Russia insists that the awards would not exist but for the tribunals' conclusion that Crimea is Russian territory—a determination Russia characterizes as geopolitical rather than commercial. We disagree.

Russia's argument stumbles out the gate. It asserts that, to invoke the FSIA's arbitration exception, the award must in fact be governed by a relevant treaty. But that is not what the statute says. Section 1605(a)(6) provides that the arbitration exception applies so long as "the agreement or award is or *may be* governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6)(B) (emphasis added). Congress chose its words carefully. The statute requires only the possibility of treaty governance, not certainty. Put differently, the question is not whether the New York Convention ultimately controls the award, but whether it plausibly could. Potential coverage suffices. And so, on this point as well, Russia's argument fails.

With that argument rejected, the proper question becomes whether the New York Convention potentially governs the awards in this case. On that question, our caselaw has long been settled. "[T]he New York Convention 'is exactly the sort of treaty Congress intended to include in the arbitration exception.'" *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 123–24 (D.C. Cir. 1999) (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993)). We have said as much repeatedly, and without equivocation. *See Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria* (*P&ID*), 27 F.4th 771, 776 (D.C. Cir. 2022) ("We have recognized that 'the New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception.'" (quoting *Creighton*, 181 F.3d at 123–24)); *Stileks*, 985 F.3d at 877 n.3 ("Nor is there doubt that the New York Convention, ratified by the United States, calls for the enforcement of arbitral awards." (citing *Creighton*, 181 F.3d at 123–24)).

That said, the Convention's reach has limits. It applies only where certain conditions are met. The Convention requires that the arbitrated dispute "(1) arise out of a legal relationship that is (2) considered as commercial." *Zhongshan*, 112 F.4th at 1062 (citation modified).

1

The Convention's first requirement—a legal relationship—is not demanding. Under the Convention, such a relationship exists "if there is an agreement, whether contractual or not." *Id.* But not every agreement qualifies. The agreement must "explicitly contemplate[] which parties it would obligate"; it must determine "the extent of the obligations"; and it must provide "the legal framework to govern the arrangement." *Diag Hum., S.E. v. Czech Republic–Ministry of Health*, 824 F.3d 131, 135 (D.C. Cir. 2016). When those elements are present, the Convention's legal relationship requirement is met. The Investment Treaty satisfies each of these elements.

To begin, it "explicitly contemplate[s] which parties it would obligate." *Id.* at 135. Article 2(2) of the Investment Treaty requires that "[e]ach Contracting Party guarantees, in accordance with its legislation, the full and unconditional legal protection of investments by investors of the other Contracting Party." No. 25-7005, J.A. 547; *see also* No. 25-7064, J.A. 234 (same). The obligation runs in both directions, and it runs to investors of the other State. That is sufficient. *See Zhongshan*, 112 F.4th at 1062 (concluding that a legal relationship existed because "the Investment Treaty expressly obligate[d] Nigeria to protect investments made by Chinese investors, including those by Zhongshan" (citation omitted)).

Next, the Investment Treaty determines "the extent of the obligations." *Diag Hum.*, 824 F.3d at 135. Article 2(2) of the

Investment Treaty, as discussed above, guarantees legal protection for "investments by investors of the other Contracting Party." No. 25-7005, J.A. 547; *see also* No. 25-7064, J.A. 234 (same). Article 3(1) goes further, requiring each "Contracting Party" to ensure that investments made by investors of the other party receive "treatment no less favorable than that which it accords to its own investors or to investors of any third state." No. 25-7005, J.A. 547; *see also* No. 25-7064, J.A. 234 (same). Article 4 requires that each "Contracting Party . . . shall ensure the greatest possible transparency and accessibility of [its] legislation" concerning investments made by foreign investors. No. 25-7005, J.A. 548; *see also* No. 25-7064, J.A. 234 (same). Article 5(2) specifies that the "amount of such compensation shall correspond to the market value of the expropriated investments immediately before the date of expropriation or before the fact of expropriation became officially known." No. 25-7005, J.A. 549; *see also* No. 25-7064, J.A. 235 (same). And Article 7(1) guarantees investors, after satisfying applicable tax obligations, "unimpeded transfer abroad of payments associated with the investments." No. 25-7005, J.A. 550; *see also* No. 25-7064, J.A. 235 (same). These provisions do not gesture vaguely toward obligations; they define them.

Moreover, the Investment Treaty supplies "the legal framework to govern the arrangement." *Diag Hum.*, 824 F.3d at 135. Article 9(1) provides that "[a]ny dispute between one Contracting Party and an investor of the other Contracting Party arising in connection with investments, including disputes concerning the amount, terms, and payment procedures of the compensation," falls within its ambit. No. 25-7005, J.A. 551; *see also* No. 25-7064, J.A. 236 (same). The Investment Treaty then sets the path for resolving such disputes. Article 9(1) further provides that the disputing parties "shall endeavor to settle the dispute through negotiations if

possible." No. 25-7005, J.A. 551; *see also* No. 25-7064, J.A. 236 (same). And Article 9(2) declares that if those efforts fail within six months of written notice, the dispute proceeds to "a competent court or arbitration court," the "Arbitration Institute of the Stockholm Chamber of Commerce," or an "'ad hoc' arbitration tribunal, in accordance with the Arbitration Regulations of the . . . []UNCITRAL[]." No. 25-7005, J.A. 551–52; *see also* No. 25-7064, J.A. 236 (same).

Additionally, while the Investment Treaty ran between Russia and Ukraine, not Russia and the Companies, it pledged protection and fair treatment to foreign investors.

It is, however, no novelty for an investment treaty to confer a benefit on third parties. Contract law has long recognized as much through the doctrine of third-party beneficiary—a doctrine with longstanding common law pedigree. *See* Curtis R. Reitz, *Construction Lenders' Liability to Contractors, Subcontractors, and Materialmen*, 130 U. Pa. L. Rev. 416, 423 (1981) ("It is well-settled in the law of contracts that the creation of third-party-beneficiary status occurs only when the two parties negotiating the arrangement intend to confer that status on a third party." (citation omitted)). Such an agreement "creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty." *Zhongshan*, 112 F.4th at 1062. And while the analogy between a treaty and a private contract is imperfect, it is close enough to be instructive. After all, "[a] treaty is 'essentially a contract between two sovereign nations.'" *Herrera v. Wyoming*, 587 U.S. 329, 345 (2019) (quoting *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675, *modified rev'd nom. Washington v. United States*, 444 U.S. 816 (1979)). And "the Supreme Court has analyzed a similar bilateral investment treaty as if it were a contract between the sovereign and the

investor corporation seeking to confirm an arbitral award." *Chevron*, 795 F.3d at 207.

Moreover, an arbitration clause "in an investment treaty can both (1) constitute an agreement 'for the benefit' of a private party; and (2) give rise to a separate agreement 'with' a private party." *NextEra*, 112 F.4th at 1101 (quoting 28 U.S.C. § 1605(a)(6)). An arbitration provision found in an investment treaty, like the one here, creates "a *unilateral offer* to arbitrate by each sovereign to investors of the other signatory countries." *Id.* at 1102 (emphasis added) (citation modified). Consequently, foreign investors desiring to invoke an investment treaty's arbitration clause "may accept the offer by filing a notice of arbitration, and thereby create a second arbitration agreement—this one made by the sovereign with a private party." *Id.* (citation modified).

Here, the Investment Treaty conferred specified benefits upon investors. It expressly guarantees Ukrainian investors protection of their investments and fair and equal treatment. The benefits the Investment Treaty guarantees to investors are distinct from those it guarantees to the signatory states. That is evidenced by the fact that the Investment Treaty provides two distinct dispute-resolution mechanisms: one for investor-state arbitrations, found in Article 9, and one for arbitrations between the signatory states, found in Article 10. What's more, the Companies invoked the Investment Treaty's arbitration provision here by filing notices of arbitration. Given those facts, we hold that a legal relationship exists between Russia and the Companies.

2

That discussion takes us to whether the legal relationship between Russia and the Companies is "commercial." *Zhongshan*, 112 F.4th at 1062. Russia insists that it is not. This

case, in its view, is *sui generis* because the award is geopolitical in nature, overwhelming any commercial character that the dispute might otherwise possess.  In support of that position, Russia asserts that neither of the arbitral awards would exist but for a border dispute between Russia and Ukraine.  From that premise, it reasons that the dispute turns exclusively on whether Crimea is Russian or Ukrainian territory—a question Russia labels geopolitical rather than commercial. We once again disagree.  Whatever rhetorical force the label "geopolitical" may carry, it does not do the work Russia assigns it.

Before we reach the merits of Russia's argument, however, we address the Investors' forfeiture contention.  The Investors contend that Russia forfeited this argument.  In their view, Russia raises this contention for the first time on appeal, and arguments first sprung at this stage are "plainly forfeited." *Crooks v. Mabus*, 845 F.3d 412, 422 (D.C. Cir. 2016).  And that is ordinarily how it goes, but that rule, in this instance, does not end this matter.

That rule carries an exception: "Arguments against subject-matter jurisdiction cannot be waived."  *Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 512 (D.C. Cir. 2009) (citing *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003)).  This principle is "axiomatic." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008).  Subject-matter jurisdiction, after all, "involves a court's power to hear a case."  *United States v. Delgado-Garcia*, 374 F.3d 1337, 1341 (D.C. Cir. 2004).  And while arguments in favor of jurisdiction "can be waived by inattention or deliberate choice," we, as a court of limited jurisdiction, are bound by a stricter command that "no action of the parties can confer subject-matter jurisdiction upon a federal court." *NetworkIP*, 548 F.3d at 120.

That command governs here. Russia advances its argument as a challenge to the applicability of the New York Convention to the arbitral awards—an objection that, if accepted, would defeat the district court's subject-matter jurisdiction under the FSIA. Because the argument strikes at the district court's subject matter jurisdiction, Russia has not forfeited it. But clearing this forfeiture hurdle does not carry Russia's argument. Considered on the merits, the argument does not fare well.

We have defined "commercial" as "matters or relationships, whether contractual or not, that arise out of or in connection with commerce." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 104 (D.C. Cir. 2015). On its face, this definition is quite broad. While broad, however, that reading of "commercial" maps onto the phrase's "established meaning as a term of art" in the field of international arbitration. *Diag Hum.*, 824 F.3d at 136 (citation omitted). And "[i]n the absence of contrary indication, we assume that when a statute uses [a term of art], Congress intended it to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991) (citing *Morissette v. United States,* 342 U.S. 246, 263 (1952); *Gilbert v. United States,* 370 U.S. 650, 658 (1962)).

Here, the dispute between Russia and DTEK arises from investments planted squarely in commerce. DTEK's investment in Crimea consisted of an electricity distribution business that operated the power grid and supplied "electricity to more than 780,000 consumers" across Ukraine. No. 25-7064, J.A. 56. An investment of that sort is plainly "in connection with commerce" and therefore commercial for purposes of the New York Convention. *Belize*, 794 F.3d at 104; *see also id.* (concluding that the "provision of

telecommunication services has an . . . obvious connection to commerce").

The Investors' dispute with Russia makes the point even more vividly. It concerns the seizure and sale of petrol stations—retail enterprises by any measure. In *Belize*, we held that the "sale of real property" constitutes a "transaction with a connection to commerce." 794 F.3d at 104. The arbitral tribunal found that Russia seized "a chain of 31 Petrol stations" that the Companies "owned, operated, and supplied." No. 25-7005, J.A. 60. Russian paramilitary forces then sold the remaining fuel at "substantially lower prices." No. 25-7005, J.A. 68. The Crimean government also stripped the Investors of the "right or economic management" of the stations. No. 25-7005, J.A. 70. If these facts do not establish a "connection to commerce," *Belize*, 794 F.3d at 104, it is hard to imagine what would. The record tells a straightforward account of commercial enterprises taken, sold, and transferred. That telling overwhelms Russia's attempt to recast the dispute as something else entirely.

Furthermore, contrary to Russia's insistence, neither arbitral award resolved a geopolitical dispute. In both proceedings, the tribunals expressly declined to determine whether Crimea falls under Russia's sovereignty.

In the arbitration concerning DTEK's investments, the tribunal simply observed that "there is no dispute that since 2014 Crimea is under the control of the Russian Federation—and the alleged breach occurred in 2015." No. 25-7064, J.A. 71. That statement did not purport to settle questions of sovereignty. To be sure, when construing the definition of "territory," the tribunal turned to the word's ordinary meaning, citing the tenth edition of *Black's Law Dictionary*, which defines "territory" as "[a] geographical area included within a

particular government's jurisdiction; the portion of the earth's surface that is in a state's exclusive possession and control." *Id.* (citation modified). From that definition, the tribunal drew a candid conclusion that the ordinary meaning of "territory" "encompasses the entire area within a State's possession or control, over which a government exercises *de facto* jurisdictional powers—irrespective of the question of sovereignty." *Id.*

In the Investors' arbitration proceeding, the tribunal took the same tack. It did not adjudicate competing claims of sovereignty. It instead interpreted treaty language according to its plain and ordinary meaning. That is the work of contract interpretation, not the stuff of geopolitics. The tribunals, in both proceedings, did not resolve border disputes or pronounce on international status. They applied the Investment Treaty to commercial conduct occurring in territory under Russia's *de facto* control. Nothing more—and nothing less. Thus, we conclude that the Companies have established that their legal relationship with Russia is "commercial." *Zhongshan*, 112 F.4th at 1062.

Because the Companies have shown "(1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award enforcement," *NextEra*, 112 F.4th at 1100, we hold that the district court did not err in applying the FSIA's arbitration exception.

E

We now turn to DTEK's alternative grounds for affirmance. DTEK argues that the district court's exercise of jurisdiction may be sustained under the FSIA's waiver exception because Russia implicitly waived its sovereign immunity when it ratified the New York Convention. On its telling, the Convention contemplates enforcement of arbitral

awards against contracting sovereigns in the domestic courts of other signatories, and Russia's reciprocal agreement to that regime amounts to an implicit waiver of foreign sovereign immunity.

Although we once held in an unpublished judgment that "a sovereign, by signing the New York Convention, waives its immunity from arbitration-enforcement actions in other signatory states," *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019), we have declined to "formally adopt[] [that theory]." *P&ID*, 27 F.4th at 774. We will do so again today. Because we have concluded that the district court has jurisdiction under the FSIA's arbitration exception, we need not decide whether ratification of the New York Convention alone affects an implicit waiver of foreign sovereign immunity. *See Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*, 62 F.4th 567, 576 (D.C. Cir. 2023) (explaining "the cardinal principle of judicial restraint" that courts should resolve no more than is necessary to decide the case (citation modified)).

IV

Having established that the district court properly exercised subject-matter jurisdiction, we turn to Russia's remaining argument. It maintains that the district court nonetheless lacked personal jurisdiction. According to Russia, the Fifth Amendment, entitles it, even as a foreign state, to due-process protections, and absent minimum contacts with the United States, the exercise of personal jurisdiction here would be unconstitutional. Russia acknowledges that our precedent stands in its way. It argues instead that our precedent is wrong. That is a heavy lift, and Russia fails to carry it. As before, Russia urges us to revisit ground we have already covered. And as before, we reject that request.

As a matter of course—and as Russia itself concedes—our precedent forecloses its argument. We have long held that "foreign states are not 'persons' protected by the Fifth Amendment," and therefore are not entitled to the constitutional protections afforded to private defendants. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002). That rule has been settled for decades. So whatever theoretical appeal Russia's position may have, it runs headlong into institutional reality. Even if we were inclined to revisit *Price*, we could not do so. Panels are bound by prior decisions of this court unless and until they are overturned by us "sitting en banc" or by "the Supreme Court." *See United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) (citing *LaShawn A. v. Barry,* 87 F.3d 1389, 1395 (D.C. Cir. 1996)).

Russia also cites *GSS Group Ltd. v. National Port Authority*, 680 F.3d 805 (D.C. Cir. 2012) for the rule that enforcement of an arbitral award must be dismissed for lack of personal jurisdiction where, as here, the action has no connection to the United States. Russia misconstrues that case.

*GSS Group* did not involve a foreign government. There, we explained that "precedent foreclose[d] [the appellant]'s argument," because "the Supreme Court and this court have repeatedly held that foreign corporations may invoke due process protections to challenge the exercise of personal jurisdiction over them." *Id.* at 813 (collecting cases). We read *Price* narrowly because its "limit on due process protections applied only to *an actual foreign government*," not to foreign corporations, even those owned by a state. *Id.* at 814 (emphasis added) (citation modified). That distinction matters here. Russia undoubtedly is a foreign government, not a foreign corporation. *GSS Group* therefore speaks past the instant case and is inapposite. All told, this case does not advance Russia's cause.

More too, the Supreme Court's recent holding in *CC/Devas (Mauritius) Ltd. v. Antrix Corp.* eliminates any lingering doubt that personal jurisdiction was lacking here. *See* 605 U.S. 223, 237 (2025). There, the Court held that personal jurisdiction exists under the FSIA, "when an immunity exception applies and service is proper." *Id.*; *see also Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018) (explaining that personal jurisdiction exists where "subject matter jurisdiction has been satisfied" and "proper service has been effected" (citing 28 U.S.C. § 1330(b))).

On that note, because Russia does not dispute that the Companies properly effected service, personal jurisdiction here "turns on the satisfaction of an FSIA exception." *Schubarth*, 891 F.3d at 397 n.1. As explained above, the Companies have satisfied the FSIA's arbitration exception. Therefore, we hold that the district court did not err in determining that personal jurisdiction exists in these cases.

\* \* \* \*

For the foregoing reasons, we affirm the district court's judgments.

*So ordered.*